Beidler v. Branshaw.

---

**George Beidler et al., Adm'rs, etc., v. Louisa A. Branshaw, Adm'x.**

1. PASSENGER ELEVATORS—*Duty of Persons Operating.*—The same rules applicable to other carriers of passengers are applicable to persons operating elevators for raising and lowering persons from one floor of a building to another, and it is their duty to use extraordinary care in and

about the operation of such elevators so as to prevent injury to persons thereon.

2.   SAME—*Are Common Carriers of Passengers.*—The law is well settled that persons operating elevators in buildings for the purpose of currying persons from one story to another, are common carriers of passengers.

3.   FREIGHT ELEVATORS—*Carriage of Persons as Passengers upon Them.*—The carriage of persons upon a freight elevator is analogous to the carriage of passengers by a railroad company on a freight train. The law in such cases is stated in the case of The Chicago & Alton R. R. Co. v. Arnol, 144 Ill. 261.

4.   EVIDENCE—*Of What Others May Have Done under Similar Circumstances Immaterial.*—In an action for damages resulting from the death of an employe upon an elevator, where one of the issues being tried was whether the deceased was guilty of such negligence as to preclude a recovery, what others were in the habit of doing under similar circumstances, does not tend to prove the issue, and is inadmissible.

Trespass on the Case.—Death from alleged negligence. Appeal from the Superior Court of Cook County; the Hon. AXEL CHYTRAUS, Judge presiding.    Heard in this court at the October term, 1901. Affirmed.   Opinion filed May 22, 1902.

Statement.—This is an appeal from a judgment rendered against appellants for causing, by negligence, the death of appellee's intestate.    The suit was originally brought against Jacob Beidler, the owner of a building in which was situated an elevator, in respect to which negligence is alleged.    Jacob Beidler died pending the suit, and appellants, his administrators, were substituted as defendants. The building in which the elevator is situated is known as 127 West Washington street, in the city of Chicago.    It fronts south and is five stories in height.    In the rear of the building is an elevator opening north toward Waldo Place. The shaft of the elevator is brick and is about seven and three-fourths feet square.    The north wall of the shaft is from two and one-eighth to two and one-fourth feet in thickness at the bottom.    There is a door on the first floor seven and one-half feet in height and five feet in width, which opens onto a platform in Waldo Place.    It is a sliding door and is opened by sliding it upward in a recess in the north wall.    There is a window in the north wall, the bottom or under edge of the sash of which is about nine

Beidler v. Branshaw.

feet from the top of the door when down, or about sixteen and one-half feet from the lower end of the door. This window is described by some of the witnesses as being two feet high by three feet wide, but measured by a model in evidence, which appellants' witness testified is correct and drawn to a scale of one foot to the inch, the window, including the frame, is about three feet in height. There were two lights in the window, size twenty-four by twenty-eight inches. About three and one-half inches above the glass in the window is an iron slab about six and one-half feet in length and about one and one-half inch in thickness, which is let into the wall at each end and supports the wall above it and above the window, and is the lintel of the window. From the interior edge of the iron slab or lintel, back to the wall of the recess, is about eight inches, and this recess, eight inches in depth in the wall, extends from the lintel to the bottom of the door of the first floor. There is a similar window to that above described in the north wall of the elevator shaft, on each floor above the first. The doors to the floors above the first floor are on the west side of the shaft. The elevator car is square, six and one-half feet each way, and a flat surface, and has guards or sides on the south and east about three and one-half feet high, but none on the north and west sides. Two of appellee's witnesses testified that when the elevator car, in ascending, is even with the iron lintel, the north edge of the car is about one and one-fourth inch from the lintel; another of plaintiff's witnesses, that it is about one and one-half inch from it. McCure, witness for appellants, testified that the north edge of the car, in ascending, passed within two and one-half inches of the lintel. Around the elevator shaft is a flight of stairs by which all floors of the building can be reached. The elevator was used to carry articles up to and from the various floors of the building, and the evidence tends to prove that it was also used by the tenants of the building and their employes in ascending to and descending from the different floors. The elevator was operated by one Pettit, an employe of Jacob Beidler.

Howe & Davidson occupied the second and fourth floors of the building. Edward C. Branshaw, appellee's intestate, was in the employ of Howe & Davidson. He worked for them most of the time as a teamster hauling goods to and from the building, and when not so employed was a general helper in their factory, and also did porter's work. About eleven o'clock A. M. November 30, 1896, appellee's intestate got on the elevator with a truck on which was a package of paper and paper boxes about two and one-half feet long by two feet wide. The truck was about five and one-half feet long and about three feet wide, and the total height of truck and load was about four feet. The truck was about the center of the car and there was a space of about eighteen inches between the truck and the north edge of the car. Appellee's intestate stood on the north side of the car, facing south, with his back to the north. Cable was also on the north side of the car; Richard Powers was on the south side, facing north. These, with Pettit, the elevator man, were all the persons on the car. The testimony of Powers is that when the car reached the lintel over the window, the elevator jerked and the deceased hallooed that his leg was caught. Cable testified to the same thing, except that he said Branshaw hallooed, "Oh, stop! my foot is caught!" The evidence is that his heel was caught between the edge of the elevator and the iron lintel. Cable testified that his foot was split up to his ankle. He was taken to his home, where he remained till December 3, 1896, when he was taken to a hospital. Blood poisoning followed the injury and his leg was amputated; but this did not arrest the blood poisoning and he died December 31, 1896. He was forty-four years of age at the time of his death, and left surviving him appellee, his widow. His general health was good prior to the accident, and his earnings about $1.50 per day.

AMERICUS B. MELVILLE and F. J. CANTY, attorneys for appellants.

WILLIAM E. DEVER, attorney for appellee.

Beidler v. Branshaw.

MR. JUSTICE ADAMS delivered the opinion of the court.

There is only one count in the declaration, the appellee having discontinued as to eight additional counts filed after filing the first count.   The negligence relied on is the failure to erect guards about the elevator car so as to protect persons riding thereon from being injured by the lintel above the window.  The face of that part of the wall in the recess north of the floor of the elevator was some ten inches or more north of the north edge of the elevator floor, but when the elevator floor, in its ascent, reached the lintel, the north edge of the elevator floor was only from $1\frac{1}{4}$ to $2\frac{1}{4}$ inches distant from the lintel.   The preponderance of the evidence is that it was only about $1\frac{1}{2}$ inch distant.   We think it obvious that, such being the situation, any slight inclination of the body northward of one riding on the north side of the elevator, might bring the body in contact with the lintel, in ascending.

The evidence fully warrants a finding that the elevator, although a freight elevator, was commonly used by the tenants of the building and their employes, and that appellee's intestate was, at the time of the accident, ascending in it in performance of his duty.   The care required of persons operating passenger elevators is thus stated in Hartford Deposit Co. v. Sollitt, 172 Ill. 222:

" Persons operating elevators are carriers of passengers, and the same rules applicable to other carriers of passengers are applicable to those operating elevators for raising and lowering persons from one floor to another of buildings.   It is the duty of such carriers of passengers to use extraordinary care in and about the operation of such elevators, so as to prevent injury to persons thereon."

In that case, as in this, the different floors of the building were leased by the owner to different tenants, and the negligence complained of was the negligence of the owner. In Springer v. Ford, 189 Ill. 430, the court say:

" The law is well settled that persons operating elevators in buildings, for the purpose of carrying persons from one story to another, are common carriers of passengers," citing numerous authorities, among them the case first above cited.

The main purpose of the elevator in question was to carry freight from and to the different stories of the building. The carriage of passengers on it, therefore, is analogous to the carriage of passengers by a railroad company on a freight train. The law in such case is thus stated in C. & A. R. R. Co. v. Arnol, 144 Ill. 272:

"In the operation of freight trains, the primary object is the carriage of freight, and the appliances used are, and are known by the passengers to be, adapted to that business, and the carrier is not, when transporting passengers thereon, held to a degree of care in its operation that would destroy the use of the train for its primary purpose. But the law does require that the highest degree of care be exercised that is practicable and consistent with the efficient use of the means and appliances adopted."

It appears from the evidence that goods coming to the elevator were unloaded onto the platform on the north side of the building, in front of the elevator, and from thence onto the elevator in trucks, and were then taken to the floor to which they were destined, and that the reverse of this occurred as to goods sent from the building; but we think it clear that a movable or sliding guard might have been easily constructed on the north side of the elevator so as not to interfere with the moving of trucks onto or off it, or impair its use for the carriage of freight. Evidence was introduced by the appellants tending slightly to prove that the elevator shaft and car were constructed in the usual way. Riley, witness for appellants, after testifying that the construction was usual, testified, on cross-examination, that he could not mention an elevator shaft in the city constructed as is the one in question as to doors, lintel and window. Eaton, another witness for appellants, testified that he knew only one elevator in the city constructed similarly to the one in question which was used for both freight and passengers, and which had no guards, rails or cage around it, and that one was constructed about thirty years before the trial. But the question at issue was not whether the shaft and elevator car were constructed in the usual way, but whether, in view of the manner in which

the shaft was constructed, with the lintel overhanging the recess, the appellant's intestate was or not negligent in failing to provide a guard for the north side of the elevator car. In C., R. I. & P. Ry. Co. v. Clark, 108 Ill. 113, the court say:

"It is next urged that the trial court erred in admitting evidence as to the usual mode of coupling and uncoupling cars at that switch. One of the issues being tried was, whether the deceased performed his duty with such negligence as to preclude a recovery. He was bound to use care, or no recovery could be had; and what others did or were in the habit of doing, did not tend to prove that issue. Such a course may have been careless, or even reckless; and if so, it did not justify him in omitting the observance of care. We therefore think that such evidence did not tend to prove care on the part of deceased, and the court erred in its admission."

As to the irrelevancy of such evidence, see also the following cases: Judd v. Fargo, 107 Mass. 264; Lewis v. Smith, Ib. 334; Sewall's Falls Bridge v. Fisk et al., 23 N. H. 171; Hill v. Portland & Rochester R. R. Co., 55 Me. 438; Hibler v. McCartney, 31 Ala. 501; Lawrence v. Hudson, 12 Heisk (Tenn.) 671; Hamilton v. Des Moines R. R. Co., 36 Ia. 31; Cleveland v. New Jersey Steamboat Co., 5 Hun, 523; Crocker v. Schureman, 7 Mo. App. 358; Temperance Hall Ass'n v. Giles, 33 N. J. L. 260.

The questions whether the deceased exercised ordinary care, and whether appellants' intestate, Jacob Beidler, was guilty of negligence as charged in the declaration, were questions for the jury to decide, and we see no reason for holding that the verdict is contrary to the evidence.

Appellant's counsel complain of the plaintiff's second instruction, which is as follows:

"The court instructs you that if you believe from the evidence that Edward C. Branshaw was at the time of the happening of the accident in question, in the exercise of ordinary care for his own safety, and without fault or negligence on his part lost his life by and through the negligence of the deceased, Jacob Beidler, in his lifetime, as charged in the plaintiff's declaration, then you should find

the defendants guilty and assess the plaintiff's damages at such sum as you believe from the evidence will be a fair and just compensation to the plaintiff for pecuniary loss, if any is proven, sustained by her in consequence of the death of said Edward C. Branshaw, not exceeding, however, the sum claimed in plaintiff's declaration."

The objection made to this instruction is, that there were counts in the declaration on which there could not be a recovery, and the jury, under the instruction, may have rendered a verdict on those counts, or some of them. The plaintiff, as already stated, had, in open court, discontinued as to all counts except the first. As a matter of law, therefore, the declaration consisted only of the first count. But, if it be conceded that the instruction is obnoxious to the criticism made by counsel, appellants can not avail of it, because their twelfth instruction is subject to like criticism in greater degree. It is as follows:

12. "The jury are instructed that the plaintiff must prove by a preponderance of the evidence that the defendant was guilty of some negligent act charged in the declaration *or some count thereof.*"

This instruction contains, in greater degree, the alleged fault complained of by appellants' counsel, and therefore counsel can not be heard to complain of the plaintiff's instructions. N. C. St. Ry. Co. v. Hutchinson, 191 Ill. 104.

The court did not err in refusing to give the seventeenth instruction asked by appellants. The instructions mentioned and the instructions to take the case from the jury, are the only ones to the giving or refusal of which counsel, in their argument, object.

The judgment will be affirmed.